IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JASON HAHN,                              )
On Behalf of Rose Hahn, Deceased,        )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )        Case No. 11-0776-MJR-CJP
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )

MEMORANDUM and ORDER

REAGAN, District Judge:

In accordance with 42 U.S.C. § 405(g), Plaintiff Jason Hahn, through counsel, seeks review of the final decision of the Commissioner of Social Security denying Rose Hahn's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits.[1]

A.    **Procedural History**

Rose Hahn applied for benefits in October 2005, alleging disability beginning on January 1, 2005. (Tr. 195, 202). The alleged date of onset was amended to July 1, 2005, at the first evidentiary hearing. (Tr. 13-14). The application was denied initially and on reconsideration. After holding a hearing, ALJ Anne C. Pritchett denied the application for benefits in a decision dated October 16, 2008. (Tr. 85-97). The Appeals Council granted review and remanded the case to the

---

[1]Rose Hahn passed away on April 17, 2010. According to Plaintiff's brief, the cause of death was respiratory failure. Plaintiff Jason Hahn is her widower and was substituted as claimant by the agency. (Doc. 12, p. 2). References to "Plaintiff" herein are meant to refer to Rose Hahn.

1

ALJ for further proceedings. (Tr. 101-02).

ALJ Pritchett held another hearing and denied the application in a decision dated February 5, 2010. (Tr. 106-22). The Appeals Council denied review, and the February 5, 2010, decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**B.    Issues Raised by Plaintiff**

Plaintiff raises the following points:

1.    The ALJ erred in assessing the medical evidence.

2.    The ALJ erred in assessing Plaintiff's mental impairments.

3.    The ALJ's credibility findings were erroneous.

4.    The ALJ failed to account for all of plaintiff's limitations in her assessment of Plaintiff's residual functional capacity (RFC).

**C.    Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled. **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education

and work experience.  **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7ᵗʰ Cir. 2009);  *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7ᵗʰ Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7ᵗʰ Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7ᵗʰ Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."  **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  ***See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7ᵗʰ Cir. 1995))**.  This Court uses the Supreme Court's definition of substantial evidence, *i.e*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater***, **103 F.3d 1384, 1390 (7ᵗʰ Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. ***See Parker v. Astrue***, **597 F.3d 920, 921 (7ᵗʰ Cir. 2010), and cases cited therein.**

### D. The Decision of the ALJ

ALJ Pritchett followed the five-step analytical framework described above. She determined that Plaintiff had not been engaged in substantial gainful activity since the alleged onset date. She found that Plaintiff had severe impairments of degenerative disc disease of the lumbar and cervical spine, old compression fractures at L4 and L5, mild recurrent carpal tunnel syndrome of the right hand, obesity, and degenerative changes of the left knee and right foot. She found that Plaintiff did not have a severe mental impairment. She further determined that Plaintiff's impairments did not meet or equal a listed impairment.

The ALJ determined that Plaintiff had the RFC to perform a full range of work at the sedentary exertional level. She determined that Plaintiff was able to do her past work as an office manager as it is generally performed. She also determined that there are other jobs which Plaintiff could perform, such as receptionist and clerk typist.

### E. The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born in 1963 and was 42 Plaintiffs old when she allegedly became disabled on July 1, 2005. (Tr. 230). She was last insured for DIB as of June 30, 2008. (Tr. 207).

She had worked as an owner/operator of a daycare business from 1988 to 1995, and from 2003 to 2005. Between those periods, she worked in accounting at Wal-Mart. (Tr. 261).

In a Disability Report, Plaintiff said that she was unable to work because of pain in her neck, low back, left hip, right foot and wrist. She also had headaches, a problem with her left eye, allergy and high blood pressure. (Tr. 249). She said that she was unable to sit, stand or walk for very long. Her pain made it hard to concentrate. When she had an allergy attack, she could not talk or breathe. Neck pain made it difficult to hold her head up. Her back and hip pain prevented her from bending, sitting, walking and grocery shopping. (Tr. 249).

Plaintiff obtained a GED in 1997. She had not been in special education classes. (Tr. 255).

## 2. First Evidentiary Hearing

Plaintiff was represented by an attorney at the first evidentiary hearing on June 10, 2008. (Tr. 12).

Her alleged date of onset was amended to July 1, 2005, because she worked in her home daycare business until June 30, 2005. (Tr. 14). She had 2 employees. They took care of children aged 6 weeks to 12 Plaintiffs. She started that business in January 2003. (Tr. 15). Before that, she worked in the accounting department at Wal-Mart. She spent most of her time there entering data into a computer. (Tr. 16). Before Wal-Mart, she had a daycare business with her mother. (Tr. 18).

She stopped working in July, 2005, because she could not lift the children or be on her feet to make a meal. (Tr. 19). She said she could not have worked at a sedentary job then because her feet were numb all the time and sitting made her back hurt. Her back had gotten progressively worse since 2005. (Tr. 19). At the time of the hearing, her low back pain would get

so bad that she would have to lay down to get relief about every day. She was taking medication, but it did not work. (Tr. 20).

Plaintiff also had carpal tunnel syndrome in her right arm. She had surgery, but it gave her very little relief. (Tr. 22). She said she could only use a computer for about 15 minutes. Her right hand would get tired and her fingers went numb. (Tr. 23).

She was able to sit for 10 to 15 minutes, stand for 5 minutes and walk for 15 minutes or so on a flat surface. (Tr. 23-24). She said that she had difficulty pushing and pulling objects. (Tr. 25).

Plaintiff testified that she had been depressed for some time. She related her depression to a miscarriage and the death of an infant daughter in 2004. She saw a psychiatrist. He prescribed Cymbalta. She also talked to him about being in pain. (Tr. 28-29).

She was 5'8" and weighed 275 pounds. (Tr. 32).

A vocational expert (VE) testified that Plaintiff's work as a daycare center operator was light as she performed it. Her work in the accounting department at Wal-Mart corresponded to the duties of an office manager as described in the *Dictionary of Occupational Titles*. The job of office manager is sedentary as generally performed, but her job was at the light exertional level as she performed it. (Tr. 33-34). The VE testified that, if Plaintiff could do sedentary work with only occasional exposure to respiratory irritants, she could do her past work as an office manager as it is generally performed. She would also be able to do the jobs of receptionist and clerk typist. (Tr. 36-37).

### 3.     Second Evidentiary Hearing

Plaintiff had a non-attorney representative at the second hearing on December 15, 2009. (Tr. 50).

Plaintiff testified that her first carpal tunnel surgery did not work, so the surgery was redone. The second surgery did not completely fix the problem, and she still had pain in the wrist and palm of the right hand. (Tr. 55-56). She testified that she also had shortness of breath and tightness in her chest. (Tr. 60). She had asthma and was using 3 different inhalers and taking Singulair every night. (Tr. 61).

Her weight affected her in that she had high blood pressure; she was depressed because of her weight; and she had sleep apnea. Her weight affected her breathing and her ability to stand, walk and sit. (Tr. 63).

She started seeing a doctor for depression in 2007. She did not go earlier because she thought she could deal with it on her own. He prescribed medication, which helped only a little bit. (Tr. 64-65).

A VE testified that Plaintiff had some transferrable skills from her past work. If she were limited to sedentary work with occasional exposure to respiratory irritants, she could do jobs such as bookkeeping or accounting clerk, data entry keyer, skilled order clerk and receptionist. All of these jobs exist in significant numbers in the regional and national economies. (Tr. 72-73). However, if she were limited to only occasional use of her right hand or right arm, those jobs would be eliminated. (Tr. 76).

4.    **Medical Records - Physical**

Dr. Reva Sharma was Plaintiff's primary care physician in the early 2000's. She complained of a sore neck in July 2004, and of pain in her left hip in October 2004. (Tr. 394-96). In November 2004, an x-ray showed mild degenerative changes in both sacroiliac joints. (Tr. 393). Lumbar x-rays showed mild-to-moderate degenerative changes in the lower lumbar spine. (Tr. 392). In October 2005, she complained of pain in her back, neck and hip. She also had cramps in her

hand. (Tr. 379).

In February 2006, primary care physician Dr. Carol Tan assessed Plaintiff with chronic pain of the neck and back. (Tr. 472).

Dr. Peter Weber saw Plaintiff for pain in her right wrist and right foot in April 2006. He noted she had been diagnosed with degenerative joint disease of the wrist and foot and had been prescribed Feldene, which had not helped. (Tr. 551).

In August 2006, Plaintiff saw Dr. Michael Turner, an orthopedic surgeon, for complaints of numbness in the 4th and 5th fingers of her right hand and pain and swelling in her right foot. (Tr. 452). EMG and nerve conduction studies were done. Dr. Turner wrote that the results were "not compatible" with her symptoms. The tests showed moderate carpal tunnel and some radial nerve sensory neuropathy, which are not compatible with numbness of the 4th and 5th fingers. (Tr. 448). In November 2006, she still had symptoms. Dr. Turner discussed an elective carpal tunnel release, but noted that she was on Illinois Public Aid, which his office did not accept. He also noted that she and her husband were trying to get social security disability. (Tr. 447).

Plaintiff complained to Dr. Tan of increased wheezing in March, 2007. (Tr. 571).

An x-ray on June 12, 2007, showed degenerative arthritis in the left knee and a normal left foot. (Tr. 524).

In July 2007, Dr. Weber performed a right carpal tunnel release. (Tr. 494, 805).

In August 2007, Dr. Tan assessed dyspnea, chest tightness, fatigue and bronchial asthma. (Tr. 575). She noted that Plaintiff was to begin seeing Dr. Kostiuk for treatment of depression. (Tr. 575). In August 2007, a cardiolite stress study was done due to her complaints of shortness of breath and chest heaviness. It was normal. (Tr. 491, 794). A treadmill stress test was submaximal because she did not achieve her target heart rate. (Tr. 489, 793). A pulmonary

function test showed mild obstructive airway disease. (Tr. 788).

Plaintiff was seen at the Carle Spine Institute on March 19, 2008, for evaluation of her back pain, and numbness and tingling in her feet, which she said had been present since an automobile accident in 2000. On examination, she weighed 285 pounds. Tapping on her back did not cause discomfort. She could forward bend, but backward bending was minimal. She could walk on her toes and heels. Knee and ankle jerks were equal bilaterally. Plantar reflexes were downgoing bilaterally. Touch sensation in dermatomal patterns L3 though S1 was grossly intact, but she said sensation in her right foot was less than in her left. Straight leg raising was negative. Strength against resistance was equal on both sides. X-rays showed decreased disc space height at several lumbar levels. The impression was that her pain was coming from disc degeneration at L4-5 and L5-S1, and possibly L3-4, and that her numbness and tingling were a separate problem, possibly nerve-related. The recommendation was for temporary measures for pain relief, neck exercises, physical therapy, and a neurology consult regarding the numbness. (Tr. 598-600).

On May 13, 2008, Plaintiff was seen by Dr. Clifford Johnson, an orthopedic surgeon, regarding her right hand complaints. Her symptoms had resolved for a while after a carpal tunnel release by Dr. Weber in July 2007. However, in the last 6 months, she had recurring numbness, tingling and pain in her right hand. The impression was possible recurrent carpal tunnel syndrome. Dr. Johnson recommended a corticosteroid injection, which she refused. (Tr. 614-15). However, she returned to Dr. Johnson for the injection on May 29, 2008. (Tr. 610).

Plaintiff returned to the Carle Spine Institute on May 28, 2008, for evaluation of her neck pain. She said her neck felt weak, and she had constant pain. Right turning caused her headache and pain behind her ear. On examination, she was able to fully flex and extend her neck. Left rotation was full, but right rotation was moderately limited due to pain. Light touch sensation

was intact. An x-ray showed some arthritis at C2-3, and possible degeneration of the disc at C5-6. There was some straightening of the lordotic curve. The impression was that she had arthritis in her neck. She was told that the "single best thing" she could do for both her neck and back pain was to exercise. (Tr. 604-06).

Dr. Cranston saw Plaintiff on July 1, 2008. She told him she had chronic pain in her neck, back and limbs. On examination, Plaintiff said she could not stand from a seated position without using her arms, but she was able to do so with a little encouragement. She could walk on heels and toes, although she initially said she could not toe walk. She said she could not squat due to knee problems. Hand strength was full and equal, "question effort." Sensory testing showed mild glove-stocking deficit bilaterally and questionable Tinel's and Phalen's signs at the wrist. She had good range of motion of the neck. The assessment was "diffuse pain, findings suggesting of a mild generalized neuropathy." Dr. Cranston ordered an EMG. (Tr. 702-03). An EMG on July 15, 2008, was consistent with bilateral carpal tunnel syndrome. There was no evidence of diffuse neuropathy. (Tr. 617-19). Dr. Cranston reviewed those results with Plaintiff on the same date, and he concluded that her testing was normal except for borderline bilateral carpal tunnel syndrome. He noted that she did have some tenderness throughout her back and recommended that she be evaluated by a pain specialist to rule out fibromyalgia. (Tr. 707).

Dr. Johnson saw Plaintiff for her carpal tunnel on July 14, 2008. The shot had given her temporary relief of her symptoms, so he recommended a repeat carpal tunnel release.

Dr. Cranston again evaluated Plaintiff on September 2, 2008. She said she had good improvement of her hand symptoms after the repeat carpal tunnel release. On examination, she had good range of motion of the neck and her strength was full. She was accompanied by her 19 month old daughter. The assessment was chronic back pain and recently treated carpal tunnel syndrome.

(Tr. 709).

On September 4, 2008, Plaintiff told Dr. Johnson that her fingers "feel great." (Tr. 713).

Plaintiff began seeing Dr. Julko Fullop on August 12, 2008, for right knee pain. He diagnosed osteoarthritis and pes bursitis. He recommended a cortisone injection, which she refused. (Tr. 648-50). She returned on September 25, 2008, with a complaint of left hip pain radiating down her leg and numbness in both feet. X-rays were normal, and she had a full range of motion of both hips. The doctor wanted to see an EMG that had been done in the past as he was not sure what was causing the numbness. (Tr. 651-52).

Plaintiff returned to Dr. Harms at Carle Spine Institute on September 12, 2008, after having had a cervical MRI. Dr. Harms wrote that the MRI showed straightening of the cervical spine with no obvious pressure on her nerves or spinal cord. He felt that she had arthritis of the neck. He noted that there was no surgery that would help, although she could try steroid injections. He recommended regular exercise as that would "help in the long run." (Tr. 716).

On November 4, 2008, Dr. Cranston ordered a sleep study due to Plaintiff's complaints that she snored and did not sleep well. (Tr. 720). A sleep study showed that she had sleep apnea and a CPAP machine was ordered. (Tr. 721).

On November 11, 2008, Plaintiff reported to Dr. Fullop's assistant that she was doing better with physical therapy and home exercises. (Tr. 652-53). Dr. Fullop saw her on January 13, 2009, for "form completion." She had right shoulder pain. The doctor injected her shoulder with cortisone. He noted that "Most of the time was spent filling out her social security forms." (Tr. 655-56).

In February 2009, an arterial Doppler study showed normal arterial flow in Plaintiff's

legs.  (Tr. 727).

Plaintiff was seen in the Primary Care Clinic at Lawrence County Memorial Hospital in 2008 and 2009.  (Tr. 662-95).  She complained of shortness of breath and chest heaviness in August 2008.  The impression was that it was likely asthma.  (Tr. 677).  In September 2008, she said that it was hard to breathe and that she had been coughing up blood.   (Tr. 672).  She was doing better by the next month.  (Tr. 670).  In January 2009, she requested a referral to an ear, nose and throat specialist for sinus problems.  She also wanted a referral for lapband surgery for her obesity.  (Tr. 664).

In February and March of 2009, Dr. Crites of the Weber Medical Clinic noted that Plaintiff had no feeling in her toes.  (Tr. 882, 883).

In April 2009, Dr. Cranston noted that Plaintiff had recently had her spleen removed.  In general, she was feeling better.  She told him that she had daily headaches in the past, but this was resolved and she only had a headache once every other month.  (Tr. 946).

Plaintiff continued to see Dr. Fullop for shoulder pain.  (Tr. 964-69).  In July 2009, an MRI showed a full thickness rotator cuff tear in the right shoulder.  (Tr. 970).  Dr. Fullop did surgery to repair the tear on September 23, 2009.  (Tr. 984-87).

Plaintiff consulted with Dr. Crites in July 2009 regarding possible bariatric surgery.  She said she had tried diet pills, Slimfast and a low carbohydrate diet, but had not been able to maintain weight loss.  She had been dealing with obesity her whole life.  She said she was unable to keep up with her 2-year-old daughter.  She said she had shortness of breath and joint pain and that "a lot of that is due to my weight." (Tr. 993).  She began a low carbohydrate, low fat diet under Dr. Crites' supervision.  She was to restrict her caloric intake and to exercise.  She was seen by him every month through November 2009.  (Tr. 1021-26).

5.      **Medical Opinions - Physical**

Plaintiff's attorney submitted "Multiple Impairment Questionnaire" forms completed by some of her doctors.

Dr. Tan completed a questionnaire about Plaintiff's impairments in January 2007. (Tr. 479-86). In her cover letter, Dr. Tan indicated that most of her visits had been related to blood pressure control. (Tr. 478).

In November 2008, Dr. Fullop completed a questionnaire in which he indicated diagnoses of left hip pain, right knee pain and right shoulder pain. He had been treating Plaintiff since August 2008. He assessed her functional ability as very limited. For instance, he opined that she could sit for up to an hour a day, and stand/walk for up to an hour a day. She could frequently lift only up to 5 pounds. (Tr. 623-32).

Dr. Cranston completed a questionnaire in January 2009. He diagnosed Plaintiff with diffuse pain syndrome, etiology unclear, possibly secondary to old injury. Many of his answers were explicitly based on Plaintiff's report. (Tr. 638-44). He included a letter in which he said that the prognosis for recovery was hard to state. He said, "I am not entirely certain exactly why she has all this pain." (Tr. 634-36).

6.      **State Agency Consultant Assessments**

A state agency consultant completed a Physical RFC Assessment in March 2005. He opined that she could do light work with occasional postural limitations. (Tr. 370-77).

Dr. Vittal Chapa, an internist, performed a consultative physical examination on December 27, 2005. His examination was essentially normal. Plaintiff had a full range of motion of all joints and of her cervical and lumbar spines. Grip strength was full and equal. She could do fine and gross manipulations with both hands. Her sensory examination was normal. (Tr. 412-19).

A second state agency consultant completed another Physical RFC Assessment in January 2006.  He opined that Plaintiff could do medium work with no limitations.  (Tr. 420-27).

### 7.    Medical Records - Mental

Plaintiff saw Dr. Kostiuk on August 31, 2007.  He diagnosed major depressive disorder.  Plaintiff was oriented and responsive to questions.  Her mood was depressed, and she was tearful.  There was no evidence of delusions or thoughts of harming herself.  Intelligence was in the average range.  Her insight was good and her judgment was satisfactory.  He prescribed Cymbalta and Alprazolam.[3]  (Tr. 583).  She noted that she had given birth to a baby, which had died in June 2004, and had then adopted a child.  (Tr. 584).

In January 2008, she told Dr. Kostiuk that she was overwhelmed with her responsibilities for her husband and child. The child was a year old.  (Tr. 590).

In February 2008, Dr. Kostiuk noted that he had received a disability questionnaire from Plaintiff's attorneys but felt that a DORS evaluation would be more appropriate.  (Tr. 588).

Plaintiff told Dr. Kostiuk in July 2008, that she had an "eating problem" and was binging.  (Tr. 889).   In November 2008, he again noted binge eating and wrote "legs hurt all the time possibly due to weight."  Her weight was 298 pounds.  The diagnosis was depressive disorder, not otherwise specified.  (Tr. 886).  In February 2009, Plainitff's weight was up to 305 pounds.  She told Dr. Kostiuk that her weight was getting in the way of taking care of her daughter.  She was looking into bariatric surgery.  Her mood was dysphoric, and her affect was flat.  Dr. Kostiuk wrote that she was "discouraged about how her weight adversely affected her life."  (Tr. 885).

---

[3]Alprazolam is used to treat anxiety disorders and panic disorders.  It is marketed under the brand name of Xanax.  See, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000807/, accessed on May 16, 2012.

In July 2009, Plaintiff told Dr. Kostiuk that she had stopped taking Cymbalta about 2 months earlier and did not notice much of a difference.  He again prescribed Alprazolam.  (Tr. 1002).

### 8.    Medical Opinion- Mental

On June 5, 2009, Dr. Kostiuk completed a Psychiatric Impairment Questionnaire. He identified a number of clinical findings which supported his diagnoses, including poor memory, sleep disturbance and mood disturbance.  He opined that Plaintiff had marked limitations in a number of areas of functioning, including ability to maintain attention and concentration for extended periods.  He assessed her current and highest GAF scores at 45.  (Tr. 951-60).

There was no consultative psychological examination or evaluation by a state agency consultant of plaintiff's mental impairments.

### 9.    Records submitted after the ALJ's decision

The transcript contains medical records that were not before the ALJ.  As of the time the ALJ issued her second decision, the administrative record consisted of Exhibits 1A through 36F, *i.e.,* Tr. 80 through 1092.  *See* List of Exhibits attached to ALJ's February 5, 2010, decision, Tr. 123-29.

Plaintiff submitted the additional records to the Appeals Council, which considered them in connection with her request for review.  See, AC Exhibits List, Tr. 4.  Thus, the medical records at Tr. 1030-1099, designated by the Appeals Council as Exhibits 37F through 40F, were not before the ALJ.

The medical records at Tr. 1030-1099 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence, since they were not before the ALJ.  Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." ***Luna***

***v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).** The parties have properly omitted any reference to these records in their briefs, and the Court will therefore not summarize them.

### F. Analysis

Plaintiff correctly takes issue with the ALJ's weighing of her treating doctors' medical opinions.

Plaintiff argues that the ALJ did not properly apply the so-called treating physician's rule, set out in 20 C.F.R. §404.1527(d)(2), with respect to her doctors' answers on the Multiple Impairment Questionnaire forms. These questionnaires asked the doctors to opine regarding Plaintiff's ability to perform a number of physical activities, *i.e.*, her RFC. The ALJ discounted the doctors' answers to a number of questions because they were based upon Plaintiff's subjective statements rather than the objective medical evidence or medical history. See, Tr. 115-16.

The opinion of a treating doctor is not entitled to controlling or special weight as to the issue of RFC. SSR96-8p instructs that the "RFC assessment must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, *etc*. SSR96-8p, at *5 (emphasis in original). Opinions of treating doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that is reserved to the Commissioner. *See* 20 C.F.R. §404.1527(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

**SSR 96-5p, at *2**. ***See also Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010)**.

However, the fact that the treating doctors' opinions were not entitled to controlling weight did not relieve the ALJ of the duty to explain what weight she gave them and why, considering the factors set forth in 20 C.F.R. §1527(d). An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §1527(d). **Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010) (citing Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010)).**

Here, the ALJ did not consider the checklist of regulatory factors with respect to Drs. Fullop or Cranston. She said that she discounted the answers that appeared to be based on Plaintiff's statements, and credited the answers that were based on objective signs and examinations. However, the ALJ did not specify which answers she rejected and which answers she credited. With respect to both Dr. Fullop and Dr. Cranston, she simply said that she credited the reports insofar as they showed that Plaintiff could do sedentary work.

The ALJ was wrong to dismiss the doctors' opinions to the extent that they were based on Plaintiff's statements. Obviously, the doctors did not "conduct an eight-hour examination." **Bjornson v. Astrue, 671 F.3d 640, 646 (7th Cir. 2012)**. Of necessity, they had to rely on what Plaintiff told them about how she felt and how long she could do various activities. And, the ALJ is not permitted to reject a claimant's complaints of pain "solely" because they are not supported by objective medical evidence. **Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009)**. To the extent that the ALJ rejected the doctors' opinions because they were based on Plaintiff's statements rather than objective testing, she was in error.

Further, the ALJ found it significant that the doctors filled out the questionnaires at the request of Plaintiff's counsel. This is an improper consideration. **Moss v. Astrue, 555 F.3d 556, 560-61 (7th Cir. 2009); Punzio v. Astrue, 630 F.3d 704, 712-13 (7th Cir. 2011).**

In effect, the ALJ rejected (for spurious reasons) any part of the doctors' opinions that contradicted her finding that Plaintiff could do sedentary work. However, an ALJ may not selectively consider medical evidence, categorically throwing out everything that does not support her decision. *Godbey v. Apfel*, **238 F.3d 803, 808 (7th Cir. 2000);** *Myles*, **582 F.3d at 678.**

Similarly, the ALJ erred with respect to her consideration of Dr. Kostiuk's opinion regarding Plaintiff's mental limitations. Dr. Kostiuk opined that Plaintiff had marked limitations in a number of areas, including ability to maintain attention and concentration for extended periods, and assessed plaintiff's GAF at 45. The ALJ said that she assigned the opinion "limited weight" but did not say why.

The ALJ said that she discounted the GAF score because it did not reflect her actual level of functioning, and such a low GAF score would have required counseling or therapy on a regular basis. She offered no medical evidence to support these conclusions. This was error. An ALJ cannot evaluate the medical evidence based on her own "medical conclusions." *Myles,* **582 F.3d at 677-78**.

Further, laying aside the GAF score, the ALJ did not give any reason for rejecting the rest of Dr. Kostiuk's assessment except to note that Plaintiff told him she stopped taking Cymbalta and did not feel any different. The ALJ construed this to mean that her symptoms were not as bad as she claimed. However, she cited no medical evidence to support this conclusion. There is no indication that Plaintiff had stopped taking Alprazolam. The fact that Plaintiff stopped taking one of the two drugs that Dr. Kostiuk prescribed is not an adequate reason to discount the psychiatrist's opinions as to her mental impairments.

An inability to maintain attention and concentration for extended periods can significantly affect the range of work that a person is able to do. *See O'Connor-Spinner v. Astrue*,

**627 F.3d 614 (7th Cir. 2010), and cases discussed therein.** The fact that Plaintiff's treating psychiatrist assessed her with marked limitations in that area is, therefore, important to the assessment of her ability to work. The ALJ erred in failing to explain why she rejected this assessment.

The ALJ's credibility analysis was faulty as well. ALJ Pritchett expressed her credibility findings using the type of "meaningless boilerplate" language which the Seventh Circuit has repeatedly criticized. **See Bjornson, 671 F.3d at 644-46, and cases cited therein.** She said that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 112).

The ALJ's statement is meaningless because she says that plaintiff's impairments could reasonably be expected to cause *some* of her alleged symptoms, but she never identifies which ones. In addition, the ALJ put the cart before the horse by determining Plaintiff's RFC first, and then rejecting Plaintiff's statements to the extent that they did not mesh with her RFC findings. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." **Brindisi v. Barnhart, 315 F.3d 783, 787-88 (7th Cir. 2003)**.

The Seventh Circuit Court of Appeals recently reiterated that the ALJ must determine a claimant's credibility by considering the factors set forth in 20 C.F.R. §404.1529(c) and must support her credibility findings with evidence in the record. "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." **Shauger**

***v. Astrue*, 675 F.3d 690, 696 (7ᵗʰ Cir. 2012)**.

The ALJ 's erroneous weighing of the medical opinions affected her credibility determination. Employing circular logic, the ALJ reasoned that Plaintiff's statements were contradicted by the medical evidence, but she also rejected the medical evidence because it was based on Plaintiff's statements. In short, it appears that ALJ Pritchett first reached the conclusion that Plaintiff had the RFC to do a full range of sedentary work, and then rejected any evidence that contradicted that conclusion.

### G. <u>Conclusion</u>

The ALJ's errors require remand. However, it should be clear that this Court is not making any suggestion as to whether Plaintiff was, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can only be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is, itself, a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. ***See Shalala v. Schaefer*, 509 U.S. 292, 296-98 (1993); *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7ᵗʰ Cir. 1999).**

A sentence four remand is indicated here.

The Commissioner's final decision denying Rose M. Hahn's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The undersigned Judge **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in

favor of Plaintiff and against Defendant.

IT IS SO ORDERED.

DATED: May 22, 2012


s/Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge